## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

VINCENT A. PRIMERANO,

      Plaintiff,

      v.                                 Case No. 16-2752-JAR

VORNADO AIR, LLC,

      Defendant.

## MEMORANDUM AND ORDER

Plaintiff filed suit against Defendant alleging misappropriation of trade secret, breach of contract, unjust enrichment, and quantum meruit. Before the Court is Defendant's Motion for Summary Judgment (Doc. 47), seeking dismissal of all claims on various grounds. The motion is fully briefed and the Court is prepared to rule. For the reasons stated below, the Court partially grants the motion for summary judgment.

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[1] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2] "There is no genuine [dispute] of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[3] A fact is "material" if,

---

[1] Fed. R. Civ. P. 56(a).

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 255 (1986)).

under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  A

dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of

fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine dispute of material fact

and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant

who does not bear the ultimate burden of persuasion at trial need not negate the nonmovant's

claim; rather, the movant need simply point out to the court a lack of evidence for the nonmovant

on an essential element of the nonmovant's claim.[7]

Once the movant has met the initial burden of showing the absence of a genuine dispute

of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that

there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings

to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be

admissible in evidence in the event of trial from which a rational trier of fact could find for the

nonmovant."[10]  In setting forth these specific facts, the nonmovant must identify the facts "by

reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[11]  To

---

[4] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Adler*, 144 F.3d at 670 (citing *Anderson,* 477 U.S. at 248).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied* 537 U.S. 816 (2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8] *Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[9] *Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

[10] *Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 670–71); *see Kannady,* 590 F.3d at 1169.

[11] *Adler*, 144 F.3d at 671.

successfully oppose summary judgment, the nonmovant must bring forward more than a mere scintilla of evidence in support of his position.[12]  A nonmovant may not create a genuine issue of material fact with unsupported, conclusory allegations."[13]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14]

## II.    UNCONTROVERTED FACTS

### A.    Motion to Strike

Plaintiff denied some of Defendant's statements of uncontroverted fact by referencing his letter to strike.[15]  In that letter, Plaintiff moved to strike: 1) paragraphs 5m. and 5n. and Exhibits M and N of attorney Neil Smith's affidavit for lack of foundation; and 2) Brian Cartwright's affidavit for Defendant's failure to disclose Cartwright as an individual likely to have discoverable information during initial disclosures as required by Fed. R Civ. P. 26(a)(1).[16] Defendant opposed the letter to strike on procedural and substantive grounds.

> When deciding a summary judgment motion, the Court may consider evidence submitted, if admissible in substance, even if it would not be admissible, in form, at the trial.  A party may properly authenticate a document "through a supporting affidavit or deposition excerpt from anyone with personal knowledge of the facts contained in the exhibit."[17]

---

[12] *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993).

[13] *Tapia v. City of Albuquerque*, 170 F. App'x. 529, 533 (10th Cir. 2006).

[14] *Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15] Doc. 51.

[16] *Id.* at 2.

[17] *Peterson v. Garmin Int'l., Inc.*, 833 F. Supp. 2d 1299, 1304 (D. Kan. 2011) (quoting *Toney v. Cuomo*, 92 F. Supp. 2d 1186, 1196 (D. Kan. 2000*), aff'd*, 221 F.3d 1353 (10th Cir. 2000)).

An affidavit is not required to authenticate every document submitted for consideration at summary judgment.[18] "The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances" may also satisfy the authentication requirement.[19] An exhibit may also qualify as "self-authenticated" under Fed. R. Evid. 902.

Plaintiff argues that contrary to paragraph 5m., Exhibit M is not the trademark registration for HoMedics MyBaby Ultrasonic Cool Mist Humidifier. He further argues that Exhibit M does not support Defendant's factual allegation that that product has been on the market since 2012.[20] The Court agrees with Plaintiff that Exhibit M is technically not a trademark registration, but it nonetheless substantiates the facts alleged. Exhibit M is an electronic search result for the word mark "MYBABY" from the United States Patent and Trademark website that indicates MYBABY "first use[d] in commerce" "humidifiers incorporating sound machine device" in July 2012.[21] Because it is from a government website and is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, the Court finds Exhibit M a public record.[22] Accordingly, the Court will not strike Exhibit M for lack of foundation.

Plaintiff argues that there is no foundation to assert that Exhibit N constitutes "official" advertising for any product, much less something called a Coway Air + Sound. He further

---

[18] *Law Co. v. Mohawk Const. and Supply Co.*, 577 F.3d 1164, 1170 (10th Cir. 2009).

[19] Fed. R. Evid. 901(b)(4).

[20] Doc. 47-34, ¶ 100.

[21] Doc. 47-20, Ex. M.

[22] *United States v. Iverson*, 818 F.3d 1015, 1021–22 (10th Cir.), *cert. denied*, 137 S. Ct. 217 (2016) (noting that several courts have ruled that government websites fall within the exception for public records). *See also Caiz v. Roberts*, — F. Supp. 3d —, 2016 WL 7335573, at *3 (C.D. Cal. Dec. 16, 2016) (court took judicial notice of file history downloaded from United States Patent and Trademark Office's website).

argues that Ex. N does not support the factual allegation that the Coway Air + Sound product has been on the market since 2013[23] since there are no dates on Exhibit N.  The Court disagrees. Exhibit N appears to be a brochure for Coway's 2 in 1 Air Purifier + Soothing Sounds.  It contains a "JAN2013A" stamp, which suggests that it was published in January 2013.  Given its appearance, content, and other characteristics, the Court finds Exhibit N would be admissible in evidence through a witness with personal knowledge of their contents, and therefore, for purposes of this motion only, the Court will not strike it for lack of foundation.

As to Cartwright's affidavit, Defendant disclosed Cartwright's contribution to the development of the BreesiLS in its Revised Initial Disclosures on March 11, 2016.[24]  Although this disclosure was approximately four months after the initial disclosures deadline, it predated the factual discovery deadline by one month and the all-discovery deadline by four months. Plaintiff did not object to the revised disclosures or request clarification as to any perceived vagueness.  Additionally, Plaintiff had sufficient time to schedule Cartwright for a deposition. Under these circumstances, the Court finds the delayed disclosure of Cartwright harmless.[25] Accordingly, the Court declines to strike Cartwright's affidavit.

The Court also overrules Plaintiff's objection to paragraph 16 of Cartwright's affidavit, which states: "During the ideation and design of the BreesiLS, the use of computer-generated, looping sound as a soothing sleep aid was well-known in the industry, and upon information and

---

[23] Doc. 47-34 at 13, ¶  102.

[24] Doc. 51, Ex. C at 2.

[25] The determination of whether a Rule 26(a) violation is justified or harmless is "entrusted to the broad discretion of the district court."  *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999).  The following factors should guide the court's discretion: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness.  *Id.*

belief, was also known by the general public."[26]  As a director of brand marketing, Cartwright would be aware of product features in the industry.  And under the doctrine of judicial notice, the Court may consider matters of common knowledge such as using a sound machine to aid with sleep.  Finally, because the Court denies the motion to strike on the merits, the Court finds it unnecessary to address Defendant's procedural arguments.

### B.    Uncontroverted Facts

The following material facts are either uncontroverted or, if controverted, are construed in the light most favorable to Plaintiff, the nonmovant.  Defendant, a manufacturer of fans, is currently and at all material times, a corporation headquartered in Andover, Kansas.

Plaintiff is currently and at all material times, a resident of New York.[27]  Plaintiff has a GED and no other formal education.  He has no medical or engineering training.  Despite this, he has a history of developing and marketing consumer products.

In 1997, Plaintiff designed and introduced "TV Ears," a product that wirelessly transmits audio signals from a television to an individual headset so that hearing-impaired individuals may listen to a television program with non-hearing-impaired individuals.  Plaintiff sold his interest in TV Ears in 2003, and briefly retired.  In 2009-2010, Plaintiff and a business partner designed and introduced "DrQuickLook," an intra-oral camera system that permits dental patients to view their teeth, gums, and mouth before and after any dental work.  Both products continue to be sold today.

---

[26] Doc. 47-32 at 2.

[27] In 2008, Plaintiff was dating his now wife, who resided in Baltimore, Maryland.  He spent his time between New York and Maryland.  Due to his frequent business travels, Plaintiff sometimes directed mail be sent to her address in order to ensure prompter response.

*Plaintiff's Development of his Sleep System Concept*

In 2001-2002, Plaintiff became intrigued with white noise sound machines to aid concentration and sleep. At that time, he conceived the idea of combining a fan with a white noise sound machine, but did not act upon it until 2007.[28]

In 2007, he scoured the internet, the available literature, and the commercial offerings at the time to see if any fans or other appliances had already incorporated such sound generation technology. Finding none, he conducted extensive internet research on sleep disorders, the severe harm caused by such disorders, as well as the lack of desirable, alternative ways to promote deep sleep. He also studied customer and market demographics. Additionally, he purchased three to four existing sound machines, analyzed their components, and evaluated how much it would cost to manufacture and integrate similar sound machines into a portable fan. He estimated the price range for such an integrated product from $89 to $139.[29] He discussed the concept with his then girlfriend (now wife), who helped him develop the concept and drew sketches of the product.

By mid-2008, Plaintiff estimated he spent approximately a couple of hundred hours researching and developing his product concept. He then prepared a power point presentation to present his idea to major fan manufacturers with the intent of working out a compensation arrangement if they used his concept.

---

[28] Doc. 47-18, Primerano Dep. at 74–77.

[29] Doc. 47-12, 8/28/2008 Power Point Presentation at 13.

### *Plaintiff Presents his Product Idea to Defendant*

On August 4, 2008, Plaintiff emailed Vornado and asked if "you accept proposals/product ideas for untapped market niche's? [sic]"[30]  Glen Ediger, then Director of Design/R&D for Vornado, responded the next day:

> [Vornado] will review outside product concepts.  But[] we need to have you sign an Inventor Disclosure Agreement before we look at your idea.  I have attached this form for you to review then [sign] and mail, or scan and e-mail[] it back to us.  Then we can [] discuss your idea."[31]

On August 24, 2008, Plaintiff suggested he present his idea in-person.[32]  Ediger agreed, but reiterated that the Agreement must be signed before further discussion.  On August 25, 2008, Plaintiff executed the Agreement.[33]  Due to technical difficulties with email attachments, the parties agreed that Plaintiff could bring the agreement to the scheduled meeting at Defendant's facility in Andover, Kansas on September 4, 2008.

Prior to traveling to Defendant's headquarters, Plaintiff shared his PowerPoint slides and report with his uncle, Sam Vulcano, a prominent attorney based in Syracuse, New York with the Sugarman Law Firm.

Upon arrival at Defendant's facility, Ediger gave Plaintiff a tour of the facility and took him out to lunch, where Plaintiff discussed the general characteristics of his product concept to Ediger.  After lunch, they returned to the facility for Plaintiff's power point presentation.  The following Vornado executives were present at the meeting: Glen Ediger; Gary Israel, Director of Design and Research and Development; Jesse May, Director of Engineering; Regan Axtel,

---

[30] Doc. 47-25, Product Idea Email Thread at 6.

[31] *Id.* at 5.

[32] *Id.* at 3–4.

[33] The parties dispute where Plaintiff executed the agreement.

Product Marketing Manager; and Drew Jones, Chief Development Officer and Executive Vice President.

Prior to the presentation, Ediger signed the Disclosure Agreement on Defendant's behalf and gave Plaintiff the original. The agreement stated the parties agreed to the following conditions prior to disclosure:

1. The disclosure by [Plaintiff] to [Defendant] is considered to be confidential.
2. The disclosure or demonstration is . . . purely voluntary.
3. No obligation for compensation of any kind is assumed by [Defendant] unless a formal contract has been entered into, and any agreement must be in writing and executed under the seal of [Defendant].
4. If after disclosure to [Defendant] it is determined that [Defendant's] own staff has been working on this same idea, they will immediately disclose that fact to [Plaintiff] along with all evidence of proof of their work on said idea to the extent the evidence of such work does not go beyond the proprietary technology disclosed by [Plaintiff].
5. It is understood that compensation for use of the idea or invention will be subject to negotiations between the parties and that if patent protection is ultimately or finally denied with regard [to] the proprietary technology by the United States Patent Office, the amount of compensation will be reduced. To the extent that [Defendant] and [Plaintiff] do not believe the propriety technology will be the subject of an application for a patent, the compensation for the use of the propriety technology will be subject to a final resolution of such matter between the parties. If the amount of the compensation cannot be agreed upon, [Defendant] shall not seek to use the propriety knowledge for its own benefit; provided, however if such proprietary technology is currently available in the marketplace, [Defendant] has the right to pursue the use of this type of proprietary technology in the future if [Defendant] later determines that this type of technology is appropriate for its line of products.[34]

The Agreement also provided that "[Plaintiff] agrees that [his] claim to compensation shall be limited to the protection granted by laws relating to patents or proprietary trade secrets."[35]

Plaintiff labeled his power point presentation the "Vornado Sleep System" and marked each page as "Product Concept <u>Confidential</u>."[36] He touted the system as a "Drug Free . . . Non

---

[34] Doc. 47-24.

[35] *Id.*

Addictive solution for a better nights [sic] sleep" for "all ages."[37]  Plaintiff's product concept

included the following features: 1) a sound machine that could produce white noise along with

other sounds such as rain, babbling brook, and ocean waves; 2) a fan with traditional speed

controls that also could run in three different modes, including a sound only, fan only, or

combined mode; 3) manual controls with night light; 4) a clock/alarm; and 5) a wireless

remote.[38]

     According to Plaintiff, Defendant's executives seemed enthusiastic about his product

concept throughout his presentation.  But during a mid-meeting break, after Defendant's

executives convened separately, the meeting tone changed.  Towards the end of his presentation,

Jones told Plaintiff that Vornado had been working on similar types of systems.  Plaintiff asked

for proof as required by the Agreement, but none was ever provided.  Plaintiff, nonetheless, left

the meeting "totally excited."[39]  After he left Defendant's facility, Plaintiff called his friend,

Grant Gaynor, and told him all about the presentation.

     On September 16, 2008, Jones sent Plaintiff a letter, informing him that Vornado did not

wish to pursue the "Sleep System," stating:

> We are always looking for the·next big (sic) idea to deliver an outstanding
> product to consumers.  We recognize the passion and research you have
> completed in assessing the market.  The benefits of restful, deep sleep are well
> documented.  There are numerous options for consumers to choose to aid their
> sleep patterns.  Your idea is a mix of current applications in the market.
> As a point of reference, Vornado circulators are currently used in bedrooms to
> provide air circulation as well as pleasant background noise aiding consumers
> with their sleep patterns.  You may even notice on some of our product
> packaging, we depict use of the product while consumers are sleeping.  We work

---

[36] Doc. 47-4 at 42-59.

[37] *Id.* at 47-48.

[38] *Id.*

[39] Doc. 47-19, Primerano Dep. at 177.

very diligently to ensure there is a pleasing sound quality to our products so a consumer has a multi-sensory benefit while in proximity of our products.

As noted in our meeting, this is a market segment that Vornado was aware of prior to your visit.  We have explored, discussed, and sketched product concepts that improve the environmental comfort for consumers including night-time, sleep use.  These product concepts incorporate the use of background noise, air movement, physical pressure comfort, air quality, air temperature, and diverted or directional air flow.  The concepts have also incorporated using lights, clocks, auxiliary electronic connections such as MP3, radio or CD.  In the above noted circumstances[,] we do have art or written documentation on such product ideas.

In light of our own product ideas aimed at a similar consumer segment and the financial commitment that is still required on advancing your idea, we do not wish to pursue the "Sleep System" using a white noise generator in a fan as you have presented.  You have not taken this product concept to a point of confirming the health benefits or the product efficacy.  Therefore, the development costs, research time, market penetration and supporting marketing claims are solely our responsibility.  We do not see the basis for your request of a down payment or royalty.  We also do not believe that your presentation precludes Vornado from executing any previous idea or concept as noted above that could be determined to assist consumers with more restful sleep patterns.[40]

On September 18, 2008, Plaintiff replied by email:

Clearly I am not comfortable with your letter . . . , the agreement I signed stated in section 4 that Vornado was to **immediately** disclose proof of working on a similar idea.  In this case, the benefits of more restful sleep using a fan or white noise.

What I brought to you was an idea that no one in your company had been working on or even thinking about other than in casual conversation, that was clearly stated to me in the meeting by your staff and at lunch with Glen.

It seems very obvious that something is very wrong here, it was clear that everyone in the meeting was overtaken and had a surprised and positive reaction to the product idea, including yourself.

The bottom line is it appears I was taken advantage of, thinking I was in the company of honest people.  You stated in your letter of having written documentation and artwork, why was it not disclosed? [sic] as per the agreement both parties signed.

I am also requesting all material I brought to Vornado to be returned to me as requested.[41]

On September 19, 2008, Jones replied via email that Plaintiff's materials were being

returned to him, that Plaintiff's idea of using white noise to promote sleep was not proprietary,

---

[40] Doc. 47-4 at 60.

[41] Doc. 47-28 at 2 (emphasis in original).

and that Vornado was not interested in pursuing a "white noise generator fan."[42]  Jones also addressed Vornado's verbal disclosure at the meeting and stated that Vornado had lived up to its commitment.  Vornado did not hear from Plaintiff again until the instant lawsuit was filed.

Plaintiff later presented his product concept to Hunter Fans.[43]  Hunter gave a response similar to Vornado — it was not something it saw itself doing.[44]

In July 2015, Plaintiff considered manufacturing his product concept himself.  He again conducted an internet search to see if any similar products were commercially available.  He found Defendant's BreesiLS, which he thought was strikingly similar to his product concept – a fan with a white noise machine.  Plaintiff filed this suit against Defendant on July 15, 2015.

### Vornado's Development of the BreesiLS

In June 2012, Vornado formed a team to brainstorm and develop new product ideas called VAccelerator.[45]  The VAccelerator team consisted of five members: Brian Cartwright, Cole Hoppock, Chase Hoppock, Tanya Potter, and DJ Bell.  None of them were present at Plaintiff's 2008 presentation.  The VAccelerator team came up with the idea for a baby line of products, and, specifically conceived of using white noise in nursery appliances between June and October 2012 after a study came out that air circulation could prevent Sudden Infant Death Syndrome.[46]  In early 2014, the VAccelerator team presented a BreesiLS prototype to Vornado executives, including but among others, Drew Jones and Regan Axtell.  Vornado first manufactured BreesiLS at the end of 2014, and its first sales occurred in the first quarter of 2015.

---

[42] *Id*. at 1.

[43] Doc. 47-19, Primerano Dep. at 252-55.

[44] *Id*. at 254.

[45] Doc. 47-32, Cartwright Aff., ¶ 2.

[46] *Id*., ¶¶ 7–10.

Defendant marketed BreesiLS as a baby product that creates a safe and soothing nursery environment by providing good air flow and circulation with a night light and four soothing sounds: white noise from a fan, "womb," "brookside," and "froggy night."[47]

### Other Products with Integrated Sound Machine

The BreesiLS was not the only product in the market that integrated a sound machine with another appliance. Homedics introduced in commerce humidifiers with sound machines called MyBaby in July 2012.[48]  Coway also had an air purifier and sound machine on the market in January 2013 called the 2 in 1 Air Purifier + Soothing Sound.[49]

## III.    DISCUSSION

Defendant seeks summary judgment on five grounds: 1) Plaintiff's breach of contract claim is barred by the statute of limitations; 2) Plaintiff's concept was not a trade secret entitled to protection; 3) BreesiLS is different from Plaintiff's concept and was developed through independent invention; 4) Plaintiff's punitive damages claims are unsupported by the record; and 5) Plaintiff's claims for unjust enrichment and quantum meriut are duplicative of the misappropriation claims, barred by the statute of limitations, and displaced by the Kansas Uniform Trade Secret Act ("KUTSA").  Defendant argues that after applying New York's choice of law rules, Kansas law governs all four of Plaintiff's claims including their accrual.  It, however, concedes that New York's limitations period would likely apply.[50]  Plaintiff did not brief the choice of law issue.  Instead, he essentially argued that under either New York or

---

[47] *Id.*, ¶¶ 8 and 12.

[48] Doc. 47-20, Ex. M.

[49] Doc. 47-21, Ex. N.

[50] Doc. 47-33 at 6.

Kansas law, all of his claims survive summary judgment. But in the Pretrial Order, Plaintiff

maintained that Kansas law applied to all claims.[51]

### A.    Choice of Law in General

Before addressing the merits of Defendant's motion for summary judgment, the Court

must first determine the applicable substantive law for each claim.[52] In a diversity case, a federal

court adjudicating state law claims ordinarily applies the substantive law of the forum state.[53]

Where a case is transferred pursuant to 28 U.S.C. § 1404(a), as was the case here, the law of the

transferor court applies.[54] Because the present matter was transferred from the Northern District

of New York, the Court will apply New York's choice of law rules.[55]

New York's choice of law rules are multi-layered. It begins with a two-step inquiry.[56]

The first step is to determine whether an actual conflict exists between the laws of the

jurisdictions involved.[57] An "actual conflict" exists where "the applicable law from each

jurisdiction provides different substantive rules" and those differences are "relevant to the issue

at hand" and have a "significant *possible* effect on the outcome of the trial."[58] Where there is no

---

[51] Doc. 74 at 2.

[52] *Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166, 176 (S.D.N.Y. 2016) ("Choice of law analysis is conducted on a claim-by-claim basis.").

[53] *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

[54] *See Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964) (holding that the substantive law of the transferor court applies when the defendant initiates transfer); *Ferens v. John Deere Co.*, 494 U.S. 516, 524-25 (1990) (holding that the substantive law of the transferor court applies when the plaintiff initiates transfer); *Trierweiler v. Croxton*, 90 F.3d 1523, 1532 (10th Cir. 1996) (transferee court must follow choice of law rule of transferor court).

[55] *Waller v. Pittsburgh Corning Corp.*, 742 F. Supp. 581, 585 (D. Kan. 1990), *aff'd*, 946 F.2d 1514 (10th Cir. 1991) (transferee court sitting in Kansas applied Texas choice of law rules).

[56] *Liberty Mut. Fire Ins. Co. v. Burlington Ins. Co.*, No. 15 CIV. 3438, 2016 WL 4046875, at *4 (S.D.N.Y. July 27, 2016).

[57] *Elgin Sweeper Co. v. Melson Inc.,* 884 F. Supp. 641, 648 (N.D.N.Y 1995).

[58] *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331–32 (2d Cir. 2005) (emphasis in original) (quoting *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir.1998)); *Tronlone v. Lac d'Amiante Du*

actual conflict, the second step is unnecessary and New York law will apply.[59]  But if an actual

conflict exists, then the Court must proceed to the second step and perform a choice of law

analysis.[60]

"New York applies separate choice-of-law approaches to contract and to tort claims."[61]

For contract and quasi-contract claims, New York courts apply a "center of gravity" analysis,

which requires examining "the place of contracting, negotiation and performance; the location of

the subject matter of the contract; and the domicile of the contracting parties."[62]

For tort cases, New York employs an "interest analysis" so that "the law of the

jurisdiction having the greatest interest in resolving the particular issue" applies.[63]  The interest

analysis requires courts to look only to those facts or contacts that relate to the purpose of the

particular law in conflict.[64]  "Under this formulation, the significant contacts are, almost

exclusively, the parties' domiciles and the locus of the tort."[65]  New York also distinguishes

between types of torts — those that regulate conduct and those that allocate losses, resulting in

the following rules.[66]  If the law in conflict involves regulating conduct, then the law of the place

where the tort occurred will generally apply because that jurisdiction has the greatest interest in

---

*Quebec, Ltee*, N.Y.S.2d 79, 80 (N.Y. App. Div. 2002); *Simon v. Philip Morris, Inc*., 124 F. Supp. 2d 46, 71 (E.D.N.Y. 2000).

[59] *Curley*, 153 F.3d at 12.

[60] *Id*.

[61] *Fin. One Pub. Co. Ltd*., 414 F.3d at 336.

[62] *Phillips v. Reed Grp., Ltd*., 955 F. Supp. 2d 201, 238 (S.D.N.Y. 2013) (quoting *Allstate Ins. Co. v. Stolarz*, 613 N.E.2d 936, 940 (N.Y. 1993)).

[63] *GlobalNet Fin. Com, Inc. v. Frank Crystal & Co*., 449 F.3d 377, 384 (2d Cir. 2006); *Schultz v. Boy Scouts of Am., Inc*., 480 N.E.2d 679, 684 (N.Y. 1985).

[64] *GlobalNet*, 449 F.3d at 384 (citing *Schultz*, 480 N.E.2d at 684).

[65] *Schultz*, 480 N.E.2d at 684.

[66] *Bankers Tr. Co. v. Lee Keeling & Assocs., Inc*., 20 F.3d 1092, 1096 (10th Cir. 1994) (applying New York choice of law rules to damage allocations laws) (citing *Cooney v. Osgood Mach., Inc.*, 612 N.E.2d 277, 280 (N.Y. 1993)).

regulating conduct within its borders.[67]  If the law in conflict involves allocating losses, then the

law of the parties' domicile applies where they share a common domicile.[68]  Where the parties

are domiciled in different jurisdictions, the law of the site of the tort shall apply unless "it can be

shown that displacing that normally applicable rule will advance the relevant substantive law

purposes without impairing the smooth working of the multi-state system or producing great

uncertainty for litigants."[69]

   With these general rules in mind, the Court will set forth which state law applies under

each claim's respective section.  New York's statutes of limitations, however, apply to all claims.

"New York courts generally apply New York's statutes of limitations, even when the injury

giving rise to the action occurred outside New York," unless suit was brought by a non-resident

plaintiff, which would trigger New York's borrowing statute.[70]  Because Plaintiff was and is a

resident of the state of New York, the Court will apply New York's limitations periods.[71]

### B.    Misappropriation of Trade Secret
### 1.    Kansas Law Governs the Misappropriation Claim

   Although Kansas and New York have the same three-year limitations period for

misappropriation of trade secrets claims, they differ in several ways.  First, in Kansas, an action

for misappropriation accrues "after the misappropriation is discovered or by the exercise of

---

[67] *GlobalNet*, 449 F.3d at 384; s*ee also AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 270 (2d Cir. 1992); *Elmaliach v. Bank of China Ltd.*, 971 N.Y.S.2d 504, 2013 N.Y. Slip Opin. 05858, at *7 (N.Y. App. Div. Sep. 17, 2013).

[68] *Butler v. Stagecoach Grp., PLC*, 900 N.Y.S.2d 541, 2010 N.Y. Slip Op. 03615, at *3 (N.Y. App. Div. April 30, 2010), aff'd as modified sub nom. *Edwards v. Erie Coach Lines Co*., 952 N.E.2d 1033 (N.Y. 2011).

[69] *Id*. (quoting *Neumeier v. Kuehner*, 286 N.E.2d 454. 458 (N.Y. 1972)).

[70] *Landow v. Wachovia Secs., LLC*, 966 F. Supp. 2d 106, 125-26 (E.D.N.Y. 2013) (quoting *Stuart v. American Cyanamid Co*., 158 F.3d 622, 627 (2d Cir. 1998)).

[71] *Desir v. Austin*, Case No. 13 CV 912, 2016 WL 1700386, at *3–4 (E.D.N.Y. Apr. 27, 2016) (explaining New York state residents are affected only by the New York limitations period).

reasonable diligence should have been discovered."[72]  Additionally, "a continuing misappropriation constitutes a single claim."[73]  In New York, the same action "first accrues either when defendant discloses the trade secret or when he first makes use of plaintiff's ideas."[74]  Additionally, "New York courts recognize the continuing tort doctrine, such that each use by the defendant of plaintiff's trade secret constitutes a new, actionable tort."[75]

Second, New York applies a common law test, requiring a plaintiff to demonstrate: 1) that it possessed a trade secret, and 2) that the defendant used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means.[76]  Kansas adopted the Uniform Trade Secrets Act ("UTSA"), which similarly requires a plaintiff to show that it has possession of a valid trade secret, that the trade secret was disclosed or used without consent, and that the defendant knew or should have known that the trade secret was acquired by improper means.[77]  KUTSA, however, preempts any non-contract based remedy, while New York law does not.[78]  For the above reasons, the Court finds that an actual conflict exists between Kansas and New York law.

Proceeding to the next step, the Court applies the interest analysis approach since misappropriation of a trade secret is a tort.[79]  And because the law in conflict involves regulating conduct and the parties' domicile differ, the locus of the misappropriation constitutes the locus of

---

[72] K.S.A. 60-3325.

[73] *Id.*

[74] *Lemelson v. Carolina Enters., Inc.*, 541 F. Supp. 645, 659 (S.D.N.Y. 1982).

[75] *Id.*

[76] *Sarkissian Mason, Inc. v. Enter. Holdings, Inc.*, 955 F. Supp. 2d 247, 253 (S.D.N.Y. 2013), *aff'd*, 572 F. App'x 19 (2d Cir. 2014).

[77] K.S.A. 60-3320 *et seq.*

[78] K.S.A. 60-3326; *Sarkissian Mason*, 955 F. Supp. 2d at 255 (noting New York does not preempt any non-contract based remedy).

[79] *Kramer v. Sec'y, U.S. Dep't of the Army*, 623 F. Supp. 505, 507 (E.D.N.Y. 1985).

the tort and the state with the greatest interest.[80]  The Court concludes that Kansas has the greatest interest in this case.  Defendant's principal place of business is in Kansas, the parties finalized the Agreement in Kansas, Plaintiff disclosed his idea in Kansas, and Defendant allegedly misappropriated Plaintiff's idea in Kansas.[81]  The only interest New York has in this case is Plaintiff's domicile.  Kansas law therefore governs this claim.

### 2.  The Misappropriation Claim is Timely

The Court rejects Defendant's argument that the misappropriation claim accrued in September 2008 when Defendant told Plaintiff that it would not pursue his idea, that there was no basis to pay him a down payment or royalty, and that it was not precluded from executing on any of its previous ideas.  An action for misappropriation under the KUTSA accrues when the plaintiff discovers the misappropriation, or with reasonable diligence should have discovered it, not when the injury occurs.[82]

Defendant decided to combine a fan with a sound machine between June and October 2012, developed a prototype in early 2014, first manufactured the offending product at the end of 2014, and first sold it in the first quarter of 2015.  Plaintiff discovered Defendant's BreesiLS in July 2015.  Whether or not Plaintiff could have discovered the alleged misappropriation before July 2015 is disputed.  But viewing all facts and inferences in a light most favorable to the non-movant, the misappropriation claim began accruing in July 2015.  Thus, Plaintiff's misappropriation claim is timely, considering it was filed within that month.  Accordingly, the

---

[80] *Sarkissian Mason*, 955 F. Supp. 2d at 254 (In trade secret cases, New York courts often use the locus of the misappropriation to determine the locus of the tort and the state with the greatest interest.).

[81] Although it is unclear where Plaintiff signed the Agreement, it is undisputed that Ediger signed the Agreement on Defendant's behalf right before the presentation in Kansas.

[82] K.S.A. 60-3325; *Guang Dong Light Headgear Factory Co. v. ACI Int'l, Inc.*, No. 03-4165-JAR, 2007 WL 1341699, at *9 (D. Kan. May 4, 2007).

Court finds Defendant is not entitled to judgment on the misappropriation claim based on the

statute of limitations.

### 3. Trade Secret or Not

Defendant argues that Plaintiff's concept and analysis do not constitute a trade secret

entitled to protection. Plaintiff asserts his product concept, research, and analysis constituted

trade secrets.

The KUTSA defines a trade secret as:

> information, including a formula, pattern, compilation, program, device, method,
> technique, or process, that: (i) derives independent economic value, actual or
> potential, from not being generally known to, and not being readily ascertainable
> by proper means by, other persons who can obtain economic value from its
> disclosure or use, and (ii) is the subject of efforts that are reasonable under the
> circumstances to maintain its secrecy.[83]

"[T]o be a trade secret, the information must have independent economic value, must derive its

value from not being generally known or readily ascertainable, and must have its secrecy

maintained by reasonable efforts."[84] The Kansas Supreme Court considers the following factors

to determine trade secret status:

> (1) the extent to which the information is known outside of his business; (2) the
> extent to which it is known by employees and others involved in his business;
> (3) the extent of measures taken by him to guard the secrecy of the information;
> (4) the value of the information to him and to his competitors; (5) the amount of
> effort or money expended by him in developing the information; (6) the ease or
> difficulty with which the information could be properly acquired or duplicated by
> others.[85]

Defendant argues that Plaintiff's product concept was an obvious combination of existing

products that was known within the fan industry. It further argues that Plaintiff's analysis is not

---

[83] K.S.A. 60-3320(4).

[84] *Dodson Int'l Parts, Inc. v. Altendorf*, 347 F. Supp. 2d 997, 1010 (D. Kan. 2004).

[85] *Mann v Tatge Chem. Co*., 440 P.2d 640, 646 (Kan. 1968) (*quoting* Vol. 4 Restatement of the Law of
Torts § 757, Comment (b)).

a trade secret as it was based on publicly available information.  It also claims Plaintiff compromised his secret and that he did not expend significant resources to develop the secret. Lastly, it argues that Plaintiff's case must fail without expert proof to prove the elements of the misappropriation claim.

The Court finds Defendant's arguments not well-suited for summary judgment.  First, trade secret status is a question of fact.[86]  Second, trade secrets can exist in a combination of characteristics, each of which, considered separately, is in the public domain, but, taken together, may yield a competitive advantage that results in a protectable trade secret.[87]  Courts have held that advancing or improving an old product is a trade secret.[88]  Plaintiff claims his idea improved the fan and offers the price difference between the Breesi and the BreesiLS to show his concept did indeed offer a competitive advantage.

With respect to guarding the secret, Kansas law does not require the holder of a trade secret to maintain its complete secrecy; rather Kansas law requires merely that the holder of a trade secret exercise reasonable efforts under the circumstances to maintain its secrecy."[89] Plaintiff testified that he keeps his PowerPoint slides on a disk, locked in a safe at his residence. A trier of fact could find this a sufficient measure to guard the secret.

With respect to resources expended, Defendant concentrates on the amount of money Plaintiff spent purchasing sound machines.  Plaintiff counters by pointing to his time and effort, which a trier of fact could find considerable.

---

[86] *Wolfe Elec., Inc. v. Duckworth*, 266 P.3d 516, 518 (Kan. 2011).

[87] *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003); *Rivendell Forest Prods., Ltd. v. Georgia–Pacific Corp.*, 28 F.3d 1042, 1045 (10th Cir. 1994); *Mann*,  440 P.2d at 647.

[88] *Mann*, 440 P.2d at 647 (collecting cases).

[89] *Bradbury Co. v. Teissier-duCros*, 413 F. Supp. 2d 1209, 1222 (D. Kan. 2006) (quoting *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 107 F. Supp. 2d 1307, 1310 (D. Kan. 2000)).

Defendant's argument that an expert is required to prove trade secret status lacks legal support.  While it may be helpful, it is by no means mandatory.

The Court concludes that genuine issues of material fact surround the misappropriation claim.  Accordingly, summary judgment on the misappropriation claim is inappropriate.

### C.    Breach of Contract Claim

Defendant argues Plaintiff's breach of contract claim is time-barred under both Kansas and New York limitations law.  Plaintiff counters that regardless of which state limitations laws apply, his claims are timely because they did not accrue until the "last, final act that establishes all of the elements of the causes of action," which was when he discovered Defendant had used his idea.[90]  In reply, Defendant essentially argues that Plaintiff conflates the accrual rules for his breach of contract claim with his misappropriation claim.[91]  In addition, for the first time, Defendant advances that "an agreement to agree to negotiate is not enforceable in New York or Kansas."[92]

#### 1.    New York Law Governs the Breach of Contract Claim

Defendant concedes there are no significant differences between Kansas and New York law on breach of contract claims.[93]  Thus, a choice of law analysis is unnecessary and the Court will apply New York law.

---

[90] Doc. 54 at 12.

[91] *See Voiceone Commc'ns, LLC v. Google Inc.*,  Case No. 12 CIV. 9433, 2014 WL 10936546, at *10 (S.D.N.Y. Mar. 31, 2014) (explaining action for misappropriation  accrues when the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered; while breach of contract action accrues at the time of the breach).

[92] Doc. 56 at 4.

[93] Doc. 47-33 at 9.

## 2.  The Breach of Contract Claim is Timely

Under New York law, the statute of limitations for a breach of contract claim is generally six years.[94]  And a cause of action for breach of contract accrues when the breach occurs or when a party to the agreement fails to perform an obligation.[95]  "'[E]xcept in cases of fraud where the statute expressly provides otherwise, the statutory period of limitations begins to run from the time when liability for wrong has arisen even though the injured party may be ignorant of the existence of the wrong or injury.'"[96]

Defendant argues the breach occurred no later than September 19, 2008, when Jones informed Plaintiff that Vornado did not wish to pursue his product concept, that Vornado believed it was not precluded from executing on any of its own previous concepts, and that there was no basis to compensate him.  This is true if Plaintiff's claim was based on Defendant's failure to provide proof of its similar, prior ideas to Plaintiff as required by paragraph 4 of the Agreement.  But in his response to the motion for summary judgment, Plaintiff clarified that his breach of contract claim is solely based on paragraph 5.[97]

Paragraph 5 of the Agreement states that "compensation for use of the idea . . . will be subject to negotiations between the parties."[98]  Paragraph 5 talks in terms of an obligation to negotiate for compensation for use of the idea.  The record reflects Defendant considered using the idea of combining a fan with a sound machine between June and October 2012, developed a

---

[94] N.Y. C.P.L.R. 213.

[95] *Velocity Invs., LLC v. McCaffrey*, 921 N.Y.S.2d 799, 804 (N.Y. Civ. Ct. 2011) (citing *Ely–Cruikshank Co. v. Bank of Montreal*, 615 N.E.2d 985, 986 (N.Y. 1993)).

[96] *Ely-Cruikshank*, 615 N.E. 2d at 987 (quoting *Schmidt v. Merchs. Despatch Transp. Co*., 200 N.E. 824, 827 (N.Y. 1936)).

[97] Doc. 54 at 7, n.2.

[98] Doc. 47-24, ¶ 5.

prototype in early 2014, first manufactured the offending product at the end of 2014, and first

sold it in the first quarter of 2015.  Whether Defendant developed the prototype using Plaintiff's

idea or that of its development team is a factual dispute that cannot be determined on summary

judgment.  But even if the Court considered June 2012 as the accrual date, Plaintiff's breach of

contract is timely because it was brought approximately three years thereafter, well within New

York's six-year limitations period.

### 3.  An Argument Raised For the First Time in a Reply Brief is Waived.

Because Defendant advanced the unenforceability of an agreement to agree for the first

time in its reply brief, the Court will not consider it and deems it waived.[99]

### D.    Unjust Enrichment

Plaintiff alleged that Defendant benefitted from the disclosure of his product concept and

that equity and good conscience require restitution.[100]  Defendant argues that Plaintiff's claim for

unjust enrichment should be dismissed because it is barred by the statute of limitation, it is

duplicative of his misappropriation claim, and it is displaced by the KUTSA.  Plaintiff counters

that Defendant has failed to establish that Kansas law applies, and even if it did, his claim for

unjust enrichment does not conflict with his misappropriation claim.

### 1.  Kansas Law Governs the Unjust Enrichment Claim

Kansas and New York law on unjust enrichment claims conflict because Kansas bars

unjust enrichment claims based on trade secret misappropriation, while New York has no such

---

[99] *Klima Well Serv., Inc. v. Hurley*, 133 F. Supp. 3d 1297, 1302 n.2 (D. Kan. 2015) ("Arguments raised for the first time in a reply brief [on a motion for summary judgment] are waived and will not be considered") (citing *Water Pik, Inc. v. Med–Sys., Inc*., 726 F.3d 1136, 1159 n.8 (10th Cir. 2013)).

[100] Doc. 47-2 at 5, ¶¶ 26–27.

statute.[101]  For this reason, the Court finds an actual conflict exists between Kansas and New York law, requiring the Court to proceed to the next step.

Because Plaintiff pleaded his unjust enrichment alternatively, in the event the Agreement was deemed unambiguous or unenforceable,[102] the Court will treat it as a tort claim and apply the "interest analysis" applicable to tort claims.  Unjust enrichment claims concern regulating allegedly unjust conduct, thus the locus of the tort determines the prevailing law.[103]  The Court finds Kansas has the greater interest in policing tortious conduct committed in Kansas by a company with its principal place of business in Kansas.  Additionally, Plaintiff disclosed his idea in Kansas, and Defendant allegedly benefitted from the disclosure in Kansas.  Kansas law, therefore, governs Plaintiff's unjust enrichment claim.

## 2. KUTSA Displaces the Unjust Enrichment Claim

Kansas patterned the KUTSA after the UTSA, which includes an identical preemption provision.[104]  K.S.A. § 60-3326 provides the KUTSA "displaces conflicting tort, restitutionary and other law of this state providing civil remedies for misappropriation of a trade secret."  Plaintiff argues that his unjust enrichment claim does not conflict with his trade secret claim, thus the KUTSA is inapplicable.  The Court rejects this argument because Plaintiff provides no support for this conclusory argument.  Plaintiff's unjust enrichment claim seeks restitution, thus

---

[101] K.S.A. 60-3326; *Thompson v. Jiffy Lube Int'l, Inc.*, 250 F.R.D. 607, 626 (D. Kan. 2008) (finding true conflict existed between Kansas and other states as to unjust enrichment claim because its availability as a remedy differ from state to state –some states preclude such claims when an adequate legal remedy is available, and many states say the existence of an enforceable contract will preclude an unjust enrichment claim).

[102] Doc. 47-2 at 5, ¶ 25.

[103] *Negri v. Friedman*, 14-CV-10233-GHW, 2017 WL 2389697, at *4 (S.D.N.Y. May 31, 2017) (finding causes of action for fraudulent misrepresentation and unjust enrichment conduct regulating).

[104] *MCaffree Fin. Corp. v. Nunnick*, 847 P.2d 1321, 1327 (Kan. Ct. App. 1993); *Wolfe Elec., Inc. v. Duckworth*, 266 P.3d 516, 532 (Kan. 2011) (noting identical preemption language between UTSA and KUTSA).

it is restitutionary in nature and subject to displacement.[105]  Preemption is also appropriate

because Plaintiff relies upon the same operative facts for both his misappropriation and unjust

enrichment claims.[106]  Accordingly, the Court will dismiss Plaintiff's unjust enrichment claim.

### E.    Quantum Meruit

Plaintiff alleged the following for his quantum meruit claim: 1) Plaintiff disclosed his

Modified Designs and Analysis in good faith; 2) Defendant accepted and used such disclosure;

3) Plaintiff expected compensation for Defendant's use of such disclosure, and Defendant knew

that Plaintiff expected such compensation; and 4) Defendant has unjustly enriched itself and has

caused damage to Plaintiff.[107]  Defendant makes the same arguments for this claim's dismissal

— untimely, duplicative, and displacement.  Plaintiff offers the same conclusory arguments for

nondismissal — New York law governs and does not preempt non-contract based claims; but

even if Kansas law applied, KUTSA's preemption clause is inapplicable.

### 1.  Kansas Law Governs the Quantum Meruit Claim

Kansas and New York law on quantum meruit claims conflict because Kansas bars

quantum meruit claims based on trade secret misappropriation, while New York has no such

---

[105] *Glasstech, Inc. v. TGL Tempering Sys., Inc*., 50 F. Supp. 2d 722, 731 (N.D. Ohio 1999) (concluding Plaintiff's claims for quasi-contract/quantum meruit and unjust enrichment are essentially restitutionary in nature and are displaced by same preemption language).

[106] *Office Depot, Inc. v. Impact Office Prods., L.L.C.*, 821 F. Supp. 2d 912, 918 (N.D. Ohio 2011) (explaining majority interpretation of UTSA preemption is that common-law claims are preempted only to the extent that they are based on misappropriation-of-trade-secrets facts; concluding a non-UTSA claim survives only if plaintiff alleges factual matter beyond misappropriation-of-trade-secrets or other information); *Powell Prod., Inc. v. Marks*, 948 F. Supp. 1469, 1474 (D. Colo. 1996) (Preemption is only appropriate where "other claims are no more than a restatement of the same operative facts which would plainly and exclusively spell out only trade secret misappropriation") (quoting Roger M. Milgrim, Milgrim on Trade Secrets, § 1.01[4], at 1–68.14 (1996)).

[107] Doc. 47-2 at 5, ¶¶ 29–32.

statute.[108]  For this reason, the Court finds an actual conflict exists between Kansas and New York law.

Because quantum meruit claims are contractual in nature, the Court applies the center of gravity approach to determine which state law applies.  Here, Defendant's principal place of business is in Kansas, Defendant drafted the Agreement in Kansas, the parties finalized the Agreement in Kansas, Plaintiff performed his part of the Agreement in Kansas, and Defendant allegedly used Plaintiff's idea in Kansas.[109]  For these reasons, the Court finds Kansas is the center of gravity for this claim.  Kansas law, therefore, governs Plaintiff's quantum meruit claim.

## 2.  KUTSA Displaces the Quantum Meruit Claim

Plaintiff argues that his quantum meruit claim does not conflict with his trade secret claim, thus the KUTSA is inapplicable.  The Court rejects this argument because Plaintiff provides no support for this conclusory argument.  In Kansas, quantum meruit and restitution are synonymous terms.[110]  Thus, Plaintiff's quantum meruit claim is restitutionary in nature and subject to displacement.[111]  Preemption is also appropriate because Plaintiff relies upon the same

---

[108] K.S.A. 60-3326; *see also Glasstech*, 50 F. Supp. 2d at 731 (concluding quantum merit claim displaced by UTSA); *Opteum Fin. Servs., LLC v. Spain*, 406 F. Supp. 2d 1378, 1381 (N.D. Ga. 2005) (holding: 1) the GTSA is the exclusive remedy for misappropriation of trade secrets, and plaintiff cannot plead an alternative theory of recovery should the information ultimately not qualify as trade secrets, and 2) because these claims are predicated on defendants' taking and using plaintiff's confidential information and are based on the same facts  that comprise the trade secrets claims, GTSA preempts the claim for quantum meruit); John T. Cross, *UTSA Displacement of Other State Law Claims*, 33 Hamline L. Rev. 445, 461 (2010) ("Most courts agree that the UTSA displaces claims for . . . quantum meruit and unjust enrichment . . .").

[109] Although it is unclear where Plaintiff signed the Agreement, it is undisputed that Ediger signed the Agreement on Defendant's behalf right before the presentation in Kansas.

[110] *Regal Ware, Inc. v. Vita Craft Corp.*, 653 F. Supp. 2d 1146, 1150 (D. Kan. 2006); *Fusion, Inc. v. Neb. Aluminum Castings, Inc.*, 934 F. Supp. 1270, 1274 (D. Kan. 1996) ("In Kansas, quantum meruit and restitution are recognized as equivalent theories.").

[111] *Glasstech*, 50 F. Supp. 2d at 731 (concluding Plaintiff's claims for quasi-contract/quantum meruit and unjust enrichment are essentially restitutionary in nature and are displaced by same preemption language).

operative facts for both his misappropriation and quantum meruit claims.[112]  Accordingly, the Court will dismiss Plaintiff's quantum meruit claim.

## IV.    CONCLUSION

Summary judgment is inappropriate on the misappropriation claim because genuine issues of material fact exist as to whether Plaintiff's concept and analysis constitute trade secrets. Plaintiff's breach of contract was timely filed and thus, is not barred by the statute of limitation. The KUTSA preempts Plaintiff's unjust enrichment and quantum meruit claims.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff's motion to strike (Doc. 51) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's motion for summary judgment (Doc. 47) is **GRANTED IN PART and DENIED IN PART**.

**IT IS SO ORDERED.**

Dated: July 25, 2017

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[112] *Powell Prod., Inc. v. Marks*, 948 F. Supp. 1469, 1474–75 (D. Colo. 1996) (preemption section of the UTSA has been interpreted to bar claims which are based entirely on factual allegations of misappropriation of trade secrets).